IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHASE JOHANNSEN** )<br>44 Forest Avenue )<br>Bangor, Maine 00401 )<br> )<br>*Plaintiff*, )<br> )<br> )<br>v. )<br> )<br>**THE BILLIKEN CORP.** )<br>1850 Kalorama Road NW, Apt. B )<br>Washington, DC 20009 )<br> )<br>*Defendant*. )<br> ) | **COMPLAINT**<br><br>Civil Action No.: |

**COMPLAINT FOR DAMAGES**

1. This is a premises liability action seeking monetary damages for significant injuries sustained by Plaintiff when she fell down an inherently dangerous staircase at Defendant's restaurant after being served alcoholic beverages at the rooftop bar.

**JURISDICTION AND VENUE**

2. This Court has original jurisdiction for a civil action between citizens of different States and where the amount in controversy exceeds $75,000 pursuant to 28 U.S.C. § 1332(a).

3. This Court has personal jurisdiction over the Defendant, because the Defendant would be subject to the jurisdiction of the District of Columbia Superior Court, FED. R. CIV. P. 4(k); Defendant's negligence caused tortious injury to Plaintiff within the District of Columbia. *See* D.C. Code §13-423 (personal jurisdiction); D.C. Code §11-921 (subject matter jurisdiction).

1

4. This Court is the proper venue, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this action occurred in the District of Columbia.

**PRELIMINARY STATEMENT**

5. On September 5, 2019, at approximately 8:00 PM, Ms. Chase Johannsen ("Plaintiff") and her partner, Mr. Omar Coral, decided to enjoy after-dinner drinks at the rooftop bar at Perry's Restaurant in Adams Morgan. The Billiken Corporation ("Defendant") owns and operates Perry's Restaurant.

6. Perry's Restaurant occupies the top floor of a two-story, brick building at the corner of Columbia Road NW and Biltmore Street NW.  The original building's owner constructed the building in 1929, which included the rear staircase that provides rooftop access.  The owner intended the property to have a commercial use, anticipating several store fronts, but not a finished roof—there was no rooftop bar or patio. Only some years later did subsequent owners convert the space and decide to increase the revenue potential of the property by adding the rooftop deck and installing the bar.  These owners made no alterations to the staircase that provides the only identifiable and accessible rooftop access for customers.

7. The original purpose of the staircase did not contemplate the constant and heavy traffic to the roof by the public, and certainly not that future patrons would be served alcoholic beverages there and then forced to navigate down the staircase in order to leave.  Consequently, this staircase is inherently dangerous as it visually appears to be atypically narrow and high, either by virtue of design, aesthetics, or becomes so when someone drinks at the bar and attempts a descent.

8. Defendant knew of the inherent danger posed by the staircase, because over decades of occupancy and active use multiple patrons informed Defendant through social media and in person that the stairs were steep and dangerous.

9. Moreover, on the evening that Ms. Johannsen fell down those stairs, the on-site manager told Mr. Coral that this was in fact the second time someone had fallen down those stairs that month.

10. At approximately 9:15-9:30 PM, Ms. Johannsen and Mr. Coral decided to call it an evening, paid their tab, and left the rooftop bar to call a cab home. To Ms. Johannsen's knowledge the only way down from the rooftop was that staircase. Taking care not to fall and believing no other way off the roof existed, Ms. Johannsen grabbed the handrails, but despite her best efforts, she fell. She lost her grip of the handrail and due to the narrowness of the step, could not regain her balance.

11. Ms. Johannsen fell violently down from near the top of the stairs hitting her right elbow against the hard cement stairs and sliding down headfirst on her abdomen until her body came to a stop at the cement landing at the bottom of the staircase. Mr. Coral and an on-site manager rushed to her aid. Someone called 911.

12. DC Fire & EMS arrived on scene at approximately 9:33 PM. Paramedics immediately diagnosed Ms. Johannsen's dislocated elbow. However, without being able to definitively rule out further trauma, paramedics rushed Ms. Johannsen to The George Washington University Hospital Emergency Room.

13. At GWU Hospital, Emergency Room physicians in consultation with orthopedic surgeons and radiologists diagnosed Ms. Johannsen with what is called the "Terrible Triad," which is a traumatic injury where the elbow is dislocated, there is a

radial head or neck fracture (in the elbow), and coronoid fracture. This means besides being dislocated, the bones in the elbow had shattered in multiple places.

14.     Dr. James Debritz, the orthopedic surgeon, ordered that Ms. Johannsen undergo immediate, emergency surgery the next morning where Dr. Debritz removed bone, installed hardware, i.e., a right radial head replacement, and attempted to repair the remaining pieces of bone that could be salvaged—all to save the normal functionality of Ms. Johannsen's arm. From the injury and through the immediate recovery from surgery, Ms. Johannsen experienced extreme pain.

15.     After a year of treatment, physical therapy, laser therapy, and any treatment that could help Ms. Johannsen recover from this injury, Ms. Johannsen remains permanently disabled. She is unable to fully extend her arm. Any prolonged activity can cause escalating ache and general discomfort in her arm. Ms. Johannsen's orthopedic specialist, Dr. Peter Fitzgibbons, determined that Ms. Johannsen has achieved "maximum medical improvement," meaning that Ms. Johannsen's arm will not improve any further.

16.     In sum, Defendant owed a duty to guests to maintain a safe premises. Defendant breached that duty despite having knowledge that the only staircase leading to the rooftop bar was inherently dangerous. Defendant exacerbated that danger or independently caused that danger by serving Ms. Johannsen multiple alcoholic beverages, which directly and proximately caused Ms. Johannsen's damages. Ms. Johannsen seeks redress from this court.

**PARTIES**

17.     Plaintiff Chase Johannsen ("Plaintiff") is an individual who currently resides at 44 Forest Avenue, Bangor, Maine 00401. At the time of the accident, Plaintiff lived at 2700 16th Street, NW, Unit #1003, Washington, DC 20009.

18. Defendant The Billiken Corporation ("Defendant") is a corporation registered in the District of Columbia since January 25, 1984, which is located at 1850 Kalorama Road, NW, Apt. B, Washington, DC 20009. Under business license #41000137, The Billiken Corporation operates under the trade name Perry's Restaurant, which is located at 1811 Columbia Road, NW, Washington, DC 20009.

## STATEMENT OF FACTS

I. 1811 COLUMBA ROAD NW IS A BUILDING BUILT IN 1929 WITH ORIGINAL STAIRS THAT ARE DANGEROUS, BECAUSE THE STEPS ARE TOO HIGH TO THE NEXT STEP AND EACH STEP IS TOO SHORT.

19. In 1929, Simon Lyon, the original owner of what is now 1811 Columbia Road NW, built a two-story, concrete, brick, and stone building for an estimated $43,000. On the Application for the Permit to Build, Mr. Lyon stated the building would provide space for several stores, and consequently requested five variances: 1-marquise; 3-store windows; and 2-store entrances, which all would project beyond the building line. The roof would be flat and covered with slag—gravelly-looking rocks. Various stores occupied 1811 Columbia Road NW over the years, for example, an electronics repair service and the Adams-Morgan Field Office, where the Adams-Morgan Community Council met to integrate the two local schools after the end of segregation in the District.

20. Today, two restaurants occupy 1811 Columbia Road NW: Mintwood Restaurant and Perry's Restaurant. Mintwood Restaurant utilizes the ground floor and Perry's Restaurant takes up the first floor and a finished rooftop patio and bar.



21.     At no point did 1811 Columbia Road NW's original owners or the District of Columbia in 1929 consider converting the roof into a functional space like the bar and patio that now exists there, nor did they consider the higher foot traffic and usage by bar patrons.  It is for that reason the District approved and the builders installed what appears to be Class B stairs, which would make the roof accessible for service professionals accustomed to steeper and more narrow stairs and who would conduct maintenance, repair, and the like, on the roof.

22.     For ease of reference, the following diagrams visually define most of the relevant terms used to describe stairs:

6



23. Back in 1929, the Building Code for Class B stairs only has three requirements: (1) the maximum allowable pitch: 45 degrees; (2) the minimum clear width inside handrails: 32 inches; and (3) the minimum treads width (not including any nosings): 9 inches.

24. But where the contemplated use of the structure considered more traffic by the general public, Class A stairs would be required, and, in contrast, have many more requirements that improve the overall safety of the stairs:

> Stairs shall be at least 44 inches wide. All such width shall be clear of all obstructions except that handrails attached to walls may project not more than 3 ½ inches at each side within the required width. There shall be a handrail on each side of the stairs. If newels project above tops of rails, a clear width of at least 44 inches shall be provided between the face of the newel and the face of the wall or newel opposite. The rise of stairs shall be no more than 7 inches, and the tread, exclusive of the nosings, shall be not less than 10 ½ inches. No run of stairs shall consist of more than 16 risers between platforms without level landings, and the length and width of such landing shall not be less than the width of the stairs.

The Building Code of the District of Columbia 89 (1930)

25. Class A stairs are safer. They are wider. They are one and half inches longer. They are two inches shorter. This means that the slope of the stairs is less dramatic and decreases the risk of serious injury from falls.

26. Continuing the trend prioritizing safety, the current DC Building Code maintains a maximum of 7 inches for stair riser height but extends the tread depth to 11 inches. DC Building Code §1009.7.2. A flight of stairs shall not have a vertical rise greater than 12 feet between floor levels or landings. DC Building Code §1009.10.

27. Defendant rejected reasonable requests by Plaintiff's Counsel to send an engineering expert to examine and take measurements of the staircase, therefore all measurements are approximations based upon photographic evidence.

28. The stairs leading to the rooftop bar and patio at 1811 Columbia Road appear to violate the DC Building Code for 1929, because the treads appear to be under the required 9 inches for Class B stairs and 10.5 inches for Class A stairs. The rise of each step appears to be approximately 9 inches, which would violate the maximum allowable pitch under Class B stairs and are 2 inches higher than the 7 inch maximum for Class A stairs. The minimum clear width inside the handrails may be beneath the required 32 inches for Class B stairs and certainly under the required 44 inches for Class A stairs. The stairs also consist of a run that exceeds the 16 riser limitation without a level landing for Class A stairs.

29. For the same reasons, the stairs certainly violate the current DC Building Code. These stairs simply could not be built today and comply with the District's building code.

II.   **DEFENDANT CONVERTED THE ROOFTOP INTO A PATIO AND BAR, BUT MADE NO ALTERATIONS TO THE DANGEROUS STAIRS.**

30.   At some point Defendant renovated the rooftop and converted it to a rooftop patio and bar to increase the profitability of the location, but did not alter the stairway, despite knowing that it would not comply with the current building code.

III.   **DEFENDANT BECAME AWARE OF THE DANGER POSED BY THE STAIRS FROM NUMEROUS SOCIAL MEDIA POSTS DESCRIBING THE DANGER.**

31.   Starting in at least 2012, patrons on Yelp and Google specifically described the danger posed by the stairs. On October 11, 2012, Elsa M. wrote: "**side note** I will say that the stairs to the rooftop are beyond steep and could be considered a hazard, nevertheless, the ambiance is worth it. Ladies – remove your heels and Gents – watch your step. You'll both want to hold on to the railing for this one."





9

32. On July 29, 2018, Laine C. described the stairs posting, "One negative for me would be the extremely narrow stairs leading up the roof top. I was ok going up, but after a few drinks, I'd think it could be incredibly dangerous going back down again."

33. And again, just four months ago, Samantha L. posted her review on December 31, 2020, "You have to go up two long flights of stairs to get to the rooftop. I'll admit the second flight of stairs was a bit too steep. I'm glad I wasn't wearing high heels or had too many drinks."

34. The owner of Perry's Restaurant and Defendant, Mr. Saied Azali, registered with Yelp and claimed the business. This means that he would receive notifications with the actual reviews appended to each email from Yelp whenever someone posted a new comment to the website. Further evidence that Mr. Azali or some other employee would receive notices, because not only has the Yelp webpage been claimed, but it someone has actively updated it, which is demonstrated by new COVID-19 information and revised hours.

IV. DEFENDANT WAS FURTHER ON NOTICE OF THE DANGER POSED BY THE STAIRS, BECAUSE THE ON-SITE MANAGER TOLD MR. CORAL THIS WAS THE SECOND TIME THAT MONTH SOMEONE HAD FALLEN DOWN THOSE STAIRS.

35. After the accident where Plaintiff fell down the stairs from the rooftop on September 5, 2019, the on-site manager told Mr. Coral, Plaintiff's partner, that this was the second time that month that someone had fallen down those stairs.

V. PLAINTIFF TOOK REASONABLE CARE WHEN SHE FELL DOWN THE STAIRS.

36. That evening, on September 5, 2019, Plaintiff and her partner, Mr. Coral went to dinner at the Mintwood Restaurant around 6:30 PM. At approximately 8:00 PM.,

not wanting to prematurely end the nice evening they had been having, Plaintiff and Mr. Coral looked for another venue to enjoy after dinner drinks. The cooler weather offered a brief reprieve from the hot DC summer, and the lights from Perry's Restaurant's rooftop bar enticed the couple to pop next door.

37. Plaintiff and Mr. Coral consumed a few alcoholic drinks on the rooftop bar at around 9 PM.

38. Around 9:15 PM., Plaintiff and Mr. Coral paid their bar tab and left the rooftop to return home.

39. As Plaintiff approached the stairs, she looked down the staircase. Plaintiff believed there were no other stairs to use if she wanted to leave and go home. This is what she saw from the top of the stairs:



40. Because of the steep pitch line and other visual aesthetics, the stairs create a sort of vertigo effect, where it almost looks like this is an image going up instead of down. The result can be disorienting, particularly when combined with any alcohol consumption. The addition of shorter or shallower treads and higher rises, create an inherently dangerous situation. The same vertigo effect does not manifest when ascending the stairs, thus the bar, alluring as it is, creates the perfect adult trap.

41. This is the view of the stairs from the base landing looking up towards the roof access:

12



42.     Noting the steepness of the stairs, Plaintiff took hold of both handrails. Despite this, Plaintiff lost her balance and her grip on the handrail near the top of the stairs.  Plaintiff fell down the stairs landing hard on her elbow and sliding face-first, down on her abdomen finally coming to a rest at the bottom of the staircase.

VI.     DC EMS TOOK PLAINTIFF TO GWU HOSPITAL WHERE SHE UNDERWENT EMERGENCY ORTHOPEDIC SURGERY.

43.     Someone called 911 who dispatched an ambulance crew from D.C. Fire & EMS.  The ambulance crew arrived at the scene at 9:33 PM. After evaluating Plaintiff, the ambulance crew stabilized her, and with lights and sirens departed for the George

13

Washington University Hospital Emergency Room.  The ambulance crew arrived at GWU Hospital at approximately 9:55 PM.

44. With the adrenaline rush subsiding, Plaintiff began to experience extreme pain.  Plaintiff described the pain to GWU Hospital personal as a 10 on a scale of 1-10.  A picture taken of Plaintiff at GWU Hospital shows the initial bruising and elbow dislocation.



45. Emergency room staff ruled out head trauma and consulted with the Orthopedic Department.  First, doctors attempted a closed reduction—essentially popping the elbow back into place, but discovered that despite the joint now set in its proper place, the lack of stability of the elbow indicated additional trauma—radial head and neck fractures.  Dr. James Debritz, an orthopedic surgeon on service at GWU Hospital,

diagnosed what is called "the terrible triad"—an elbow fracture dislocation, a radial head fracture, a radial neck fracture, a coronoid fracture, and an elbow lateral collateral ligament avulsion.

46. This is an example of that displays most of the injuries of the terrible triad:



47. Due to the severity of Plaintiff's injuries, Dr. Debritz ordered emergency orthopedic surgery for the following morning, September 6, 2019.

48. After about three hours of surgery, Dr. Debritz installed a modular radial head replacement, reduced and fixed the right coronoid fracture, and sutured the damage to the lateral collateral ligament.

49. GWU Hospital discharged Plaintiff around 5:30 PM. on September 6, 2019.

### VII. DESPITE MONTHS OF PHYSICAL THERAPY, PLAINTIFF IS NOW PERMANENTLY DISABLED.

50. On or about September 13, 2019, Plaintiff began physical therapy at Metro Orthopedics & Sports Therapy. Physical therapy continued through December 2019, at which point Plaintiff no longer continued to experience progress towards recovery. Dr. Eric Guidi and Dr. James Gilbert, the physicians overseeing Plaintiff's physical therapy, referred Plaintiff to Dr. Peter Fitzgibbons at Maryland Orthopedic Specialists for an opinion and assessment as to what else could be done for Plaintiff.

51. On December 6, 2019, when Dr. Fitzgibbons examined Plaintiff, Plaintiff's persistent pain remained at a 4 on a scale of 1 to 10, she still could not fully extend her arm, and daily activities and ordinary motion aggravated Plaintiff's pain.

52. By May 22, 2020, Dr. Fitzgibbons noted that Plaintiff continued to experience residual stiffness and discomfort. Plaintiff could not extend her elbow beyond 45 degrees of extension. Consequently, Dr. Fitzgibbon's medical opinion was that Plaintiff had achieved maximum medical improvement, and that the current condition of Plaintiff arm will not improve with time, concluding Plaintiff would suffer with the symptoms indefinitely.

### CAUSE OF ACTION
### COUNT 1: NEGLIGENCE

53. Plaintiff restates and realleges all the allegations set forth above.

54. At all relevant times Defendant owns and operates Perry's Restaurant located at 1811 Columbia Road NW, in Adams Morgan.

55. Defendant owed a duty of care to Plaintiff by maintaining a safe premises, specifically with the back staircase leading up to a rooftop bar and patio.

56.     Defendant owed a duty of care to be reasonable in serving alcohol to patrons who can only leave the rooftop bar by descending this staircase.

57.     Defendant breached this duty of care when Defendant opened the rooftop patio and bar to patrons, because the stairway is inherently dangerous, e.g., the tread length is too short, the height of each step is too high, etc.

58.     Defendant further breached this duty of care when Defendant served Plaintiff alcoholic beverages knowing that the steep staircase is the only way to leave the rooftop bar and patio, and that alcohol consumption made accidents on the stairs more likely to occur.

59.     Defendant was on notice of the dangerous conditions posed by the staircase.  (1) Defendant had actual notice, because Defendant received numerous complaints and review through social media describing the steepness of the staircase and how the danger would be exacerbated by the consumption of alcohol. (2) Defendant had implied or constructive notice, because Defendant converted or operated the rooftop bar and patio, moreover, Perry's Restaurant occupied the same location since at least 1984, which means that Defendant would have over thirty years to discover the danger posed by the staircase; (3) Defendant had implied notice, because Defendant knew that people who had been drinking must use that staircase to leave the rooftop bar and patio; and (4) Defendant had actual or implied notice, because Defendant knew that other people had been injured falling down those stairs, particularly when the on-site manager told Mr. Coral that Plaintiff's accident was the second accident to occur on those stairs in the past month.  When Defendant knew someone else had fallen down those same stairs, Defendant had a duty to investigate the cause.

60. Defendant's breach is the factual and proximate cause for Plaintiff's injury. But for the Defendant's inherently dangerous stairs and/or the serving of alcoholic beverages to Plaintiff, Plaintiff would not have fallen down the stairs, and would not have suffered any of the injuries described.

61. Plaintiff suffered significant damages from Defendant's negligence. Plaintiff's fall caused significant physical injury, i.e., the shattering and dislocation of Plaintiff's elbow. These injuries are permanent. Plaintiff will be permanently disabled for the rest of her life. These injuries have caused and will continue to cause Plaintiff significant physical and mental pain and suffering for the foreseeable future.

62. Plaintiff has incurred and will continue to incur medical, therapeutic, and related expenses, including lost wages.

63. Plaintiff suffered these injuries without any contributory negligence on the part of Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court

a. enter judgment against Defendant;

b. award compensatory damages in an amount to be determined at trial, but believed to be at least five hundred thousand dollars ($500,000), plus costs;

c. and grant such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 13, 2021                                  Respectfully submitted,

                                                             /s/ Jonathan K. Gitlen
                                                             Jonathan K. Gitlen (D.C. Bar No. 990918)
                                                             Law Office of Jonathan K. Gitlen PLLC
                                                             900 19th Street NW, 5th Floor
                                                             Washington, DC 20006
                                                             Tel.: (202) 568-5788
                                                             Fax: (202) 301-8556
                                                             Email: jonathan.gitlen@jgitlenlaw.com

                                                             *Counsel for Plaintiff Chase Johannsen*